## Nora HARRIS *v.* CITY of LITTLE ROCK

99-1316                                        40 S.W.3d 214

Supreme Court of Arkansas
Opinion delivered March 8, 2001

*David P. Henry*, for appellant.

*Thomas M. Carpenter*, for appellee.

DONALD L. CORBIN, Justice. This is a suit brought by a taxpayer, Appellant Nora Harris, against Appellee City of Little Rock, challenging the city's issuance of revenue bonds that will, in part, finance the acquisition of land for the William Jefferson Clinton Presidential Park. On March 17, 1998, the city, through its board of directors, passed Ordinance No. 17,690, authorizing the city to issue and sell capital-improvement revenue bonds in the amount of $16,500,000 to fund park and recreational improvements. In addition to the Presidential Park, the bonds would also provide improvements to the city's zoo and its three public golf courses. Appellant challenged the ordinance under Amendment 65 to the Arkansas Constitution on the grounds that it pledged as repayment user fees other than those generated from the particular projects being funded by the bonds, and that it indirectly pledged tax revenues as repayment. Appellant also contended that an illegal exaction had occurred when the city increased the user fees at its recreational facilities. The Pulaski County Chancery Court disagreed with Appellant on all points and entered judgment in favor of the City. Appellant raises those same three arguments on appeal, which require us to interpret and construe Amendment 65

and the related statutes. Our jurisdiction is thus pursuant to Ark. Sup. Ct. R. 1-2(a)(1) and (b)(6). We affirm.

We note at the outset that we review chancery cases *de novo* on the record, but we do not reverse a finding of fact by the chancellor unless it is clearly erroneous. *Stephens v. Arkansas Sch. for the Blind*, 341 Ark. 939, 20 S.W.3d 397 (2000). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* Similarly, we review issues of statutory construction *de novo*, as it is for this court to decide what a statute means. *Id.* We are not bound by the trial court's decision; however, in the absence of a showing that the trial court erred, its interpretation will be accepted as correct on appeal. *Id.* With these standards in mind, we review Appellant's arguments.

## I. Repayment of Bonds by Project Revenues

Appellant first argues that the Presidential Park will not generate revenues and that, therefore, the ordinance issued by the city fails to comply with the requirements of Amendment 65. Appellant asserts that Amendment 65 mandates that if user fees are pledged as repayment of revenue bonds, those fees must be generated by the particular project being funded. We disagree.

In interpreting the language of a provision of the Arkansas Constitution, we endeavor to effectuate as nearly as possible the intent of the people in passing the measure. *Allred v. McLoud*, 343 Ark. 35, 31 S.W.3d 836 (2000). Where the language of the constitutional provision is plain and unambiguous, each word must be given its obvious and common meaning. *Worth v. City of Rogers*, 341 Ark. 12, 14 S.W.3d 471 (2000); *Daniel v. Jones*, 332 Ark. 489, 966 S.W.2d 226 (1998). "Neither rules of construction nor rules of interpretation may be used to defeat the clear and certain meaning of a constitutional provision." *Id.* at 499, 966 S.W.2d at 231 (quoting *Foster v. Jefferson County Quorum Court*, 321 Ark. 105, 108, 901 S.W.2d 809, 810 (1995)).

Section 1 of Amendment 65 provides in part:

> [A]ny governmental unit, pursuant to laws heretofore or hereafter adopted by the General Assembly, may issue revenue bonds for the

purpose of financing all or a portion of the costs of capital improvements of a public nature, facilities for the securing and developing of industry or agriculture, and for such other public purposes as may be authorized by the General Assembly.

Section 3(a) defines the term "revenue bonds" as:

> [A]ll bonds, notes, certificates or other instruments or evidences of indebtedness the repayment of which is secured by rents, user fees, charges, or other . revenues (other than assessments for local improvements and taxes) derived *from the project or improvements financed* in whole or in part by such bonds, notes, certificates or other instruments or evidences of indebtedness, *from the operations of any governmental unit, or from any other special fund or source other than assessments for local improvements and taxes*. [Emphasis added.]

Section 3(b) of Amendment 65 defines the term "governmental unit" as including any municipality and its agencies, boards, commissions, or other instrumentalities.

The Revenue Bond Act of 1987, enacted under Amendment 65, defines "bonds" or "revenue bonds" as "all bonds or other obligations, the repayment of which are secured by rents, loan payments, user fees, charges, or other revenues derived from any special fund or source other than assessments for local improvements and taxes[.]" *See* Ark. Code Ann. § 19-9-604(1) (Repl. 1998). Similarly, the Local Government Capital Improvement Revenue Bond Act of 1985, which was passed prior to Amendment 65, defines "revenues" as:

> project revenues or any other special fund or source other than taxes or assessments for local improvements including, without limitation, any acquired with bond proceeds and the revenues to be derived from them, and any other user fees, charges or revenues derived from the operations of any municipality or county and any agency, board, commission, or instrumentality thereof[.]

*See* Ark. Code Ann. § 14-164-402(12) (Repl. 1998).

██ It is clear from the plain language of Amendment 65 and the foregoing statutes that revenue bonds may be repaid with rents, user fees, charges, or other revenues, other than tax revenues, derived from three sources: (1) the project or improvement financed by the bonds; (2) the operations of any governmental unit; or (3) any other special fund or source other than assessments for local

improvement and taxes. Here, the city's ordinance specifically provides that the bonds are not general obligations of the city, "but shall be special obligations payable solely from fees derived from the operation of the parks and recreational facilities owned or operated by the City[.]" The city's Parks and Recreation Department is certainly an agency, board, commission, or instrumentality of the city. Thus, the user fees pledged to repay the bonds are revenues from the operation of any governmental unit. Accordingly, the ordinance is in compliance with Amendment 65.

## II. Costs for Maintenance and Operation of the City's Recreational Facilities

Appellant next argues that Ordinance No. 17,690 is unconstitutional because it indirectly pledges tax revenues to repay the revenue bonds. This argument is premised on a provision in Section 2 of the ordinance, wherein the city has covenanted "to appropriate sufficient funds to insure the efficient operations and maintenance of the park and recreational activities of the City[.]" The exhibits offered below showed that the recreational facilities consistently operated at a loss. In other words, the user fees did not cover the expenses. The city has, however, historically made up the difference from its general revenues. Appellant asserts that by pledging the facilities' user fees to repay the revenue bonds, the city will have to contribute even more money from its general revenues to insure the efficient operations and maintenance of the facilities for the life of the bonds, which extend through the year 2023. Thus, Appellant argues, by using general revenues to subsidize these parks, while the user fees are pledged to repay the bonds, the city is circumventing the prohibition in Amendment 65 that revenue bonds may not be repaid from taxes.

The City, on the other hand, argues that Amendment 65 prohibits it from pledging general revenues, or taxes, to repay the revenue bonds, but does not prohibit it from using general revenues to fund the operation and maintenance of its parks and recreational facilities. The City relies on the holding in *Rankin v. City of Fort Smith*, 337 Ark. 599, 990 S.W.2d 535 (1999). There, the appellants argued that the city had illegally exacted funds from its general revenues to help pay for bonds issued by the city for the construction of a parking deck. The appellants sought to establish the existence of an illegal exaction by alleging that the city unlawfully used its general funds to pay revenue-bond indebtedness in violation of Amendment 65. The appellants contended that the revenues

were transferred to the parking deck's fund specifically to meet alleged shortfalls in the fund's debt-service obligation for the revenue bonds. The city, however, produced an affidavit demonstrating that for each year in question, the parking facilities' revenues exceeded the debt-service obligation. This court affirmed the ruling in favor of the city based on the appellants' failure to offer countervailing proof. Here, the City asserts that *Rankin* is determinative of the issue at hand. We disagree.

The issue in *Rankin* concerned the allegation that the city was *directly* paying its debt-service obligation for the parking deck with general revenues. The appellants argued that the city had taken money from its general funds to make up shortfalls on the debt-service obligations. Clearly, Amendment 65 forbids such action. *Rankin* did not, however, involve the allegation that the city was *indirectly* paying debt service with general revenues by making up shortfalls in the operation and maintenance of the parking facilities. That is the issue to be resolved here.

■ We believe that Amendment 65 prohibits a city from doing indirectly that which it cannot do directly. Because Amendment 65 forbids repaying revenue bonds with assessments from local improvements or taxes, it correspondingly forbids pledging tax revenues to fill the gaps left by using other sources of monies to repay the bonds. In short, using tax revenues to offset losses caused by pledging revenues from user fees to cover bond indebtedness is indirectly using tax revenues to secure repayment of the bonds, which is prohibited conduct. The question then is whether the city has done so in this case. Based on the record before us, we cannot say that it has.

The only evidence presented by Appellant on this issue came from City Manager Cy Carney. He testified that the city's board of directors will make the decision as to whether and how the city will provide any additional funds to replace the user fees now pledged to the repayment of the bonds. Carney stated that he had asked the various department heads for recommendations as to how budget cuts could be made. Carney explained that he was considering proposing to the board that the shortfalls in the parks' operation be made up by budgeting cuts, such as reducing salary expenses. Appellant's attorney attempted a number of times, to no avail, to get Carney to state that the shortfalls would be supplied by the city's general fund, which is mostly comprised of tax revenues. The City objected to that line of questioning on the grounds that Carney had no authority to speak for the board, and that the

decision as to whether and how to make the up the shortfalls would be up to the board. The chancellor sustained the City's objections. Appellant's attorney only succeeded in getting Carney to state, hypothetically, that if he were to make such a proposal to the board, it would involve monies from the general fund.

▆ Appellant did not call any board members as witnesses, nor did she present any other proof on this issue. Indeed, she acknowledges in her brief that nothing in the ordinance, the bond documents, or the testimony given below identifies the source of the funds to be appropriated for the efficient operation and maintenance of the city's parks. Appellant simply assumes that "[t]he reason the source is not identified is that there is only one such source – the General Fund." This is an assumption that we are not willing or able to make. This court has consistently refused to issue advisory opinions based on facts not in evidence and events that have not yet occurred. *See, e.g., Stilley v. Priest*, 341 Ark. 329, 16 S.W.3d 251 (2000); *Villines v. Harris*, 340 Ark. 319, 11 S.W.3d 516 (2000). "[C]ourts do not sit for the purpose of determining speculation and abstract questions of law or laying down rules for the future conduct[.]" *Baker Car & Truck Rental, Inc. v. City of Little Rock*, 325 Ark. 357, 363, 925 S.W.2d 780, 784 (1996). We thus concur with the chancellor that "[t]he Court must base its findings on evidence admitted at trial, and not on assumptions as to what will happen in the future."

To make a decision on this issue, we would have to assume that (1) the City's recreational facilities will continue to operate at a loss, even after improvements to those facilities are made; (2) the City's board of directors will elect to make up the difference in any shortfalls to insure the efficient operation and maintenance of the facilities; and (3) the shortfalls will necessarily be made up from funds derived from taxes. Moreover, we would have to speculate about the effect that periodic increases in the user fees would have on the recreational facilities' revenues. Bryan Day, Director of the City's Parks and Recreation Department, testified that effective January 1, 1998, the City had increased its user fees by $2.00 at the golf courses, the fitness center, and the zoo. The data presented below only went through 1997, the year before the increases took effect.

▆ Appellant, as the complainant below, bore the burden of proving that Ordinance No. 17,690 is unconstitutional under Amendment 65. This court has long recognized that an ordinance is

entitled to the same presumption of validity that legislative enactments receive. *Lawrence v. Jones*, 228 Ark. 1136, 313 S.W.2d 228 (1958) (citing *Delony v. Rucker*, 227 Ark. 869, 302 S.W.2d 287 (1957)). Thus, similar to a statute, an ordinance is presumed constitutional, and the burden of proving otherwise is upon the challenging party. *See Craft v. City of Fort Smith*, 335 Ark. 417, 984 S.W.2d 22 (1998); *Laudan v. State*, 322 Ark. 58, 907 S.W.2d 131 (1995); *Board of Adjustment of Fayetteville v. Osage Oil & Transp., Inc.*, 258 Ark. 91, 522 S.W.2d 836, *cert. denied*, 423 U.S. 941 (1975). Where the complainant offers no proof to support the claim that the ordinance is unconstitutional, our inquiry is "limited to the face of the ordinance, with every presumption being in its favor." *Id.* at 93, 522 S.W.2d at 838.

▮ On its face, Ordinance No. 17,690 complies with the repayment provisions of Amendment 65. The ordinance reflects that the city "will pledge the fees from the park and recreational facilities owned or operated by the City more specifically defined hereinafter to secure the payment of the principal of and interest on the Bonds." The ordinance reflects further:

> The Bonds shall not be general obligations of the City, but shall be special obligations payable solely from fees derived from the operation of the parks and recreational facilities owned or operated by the City (specifically including, but not limited to, amounts deposited by the City into the enterprise funds for the zoo, golf, and War Memorial Fitness programs of the City established pursuant to Resolution No. 10,040 of the City adopted August 5, 1997), and any other fees designated and pledged by the City to such purpose[.]

The foregoing language demonstrates that the city has not pledged for repayment of the bonds any monies from taxes assessed or collected by the city. Furthermore, it is not evident from the city's covenant to operate and maintain its parks and recreational facilities at efficient levels that the city has pledged or will otherwise be required to use general revenues to offset the lost user fees. Thus, the ordinance is not, on its face, in violation of Amendment 65.

▮ Additionally, we point out that the covenant contained in the ordinance is only to provide sufficient funds to insure the *efficient* operations and maintenance of the city's recreational facilities. The covenant does not specifically require the city to maintain those facilities at their current rate. Thus, it is speculation as to whether the city will need to increase the amounts that it currently provides

to satisfy its covenant to insure the efficient operations and maintenance of the facilities. Accordingly, because this issue depends on a state of facts that is future, contingent, or uncertain, it would be premature and advisory to render a decision at this time. *See Baker Car & Truck Rental*, 325 Ark. 357, 925 S.W.2d 780. We note, however, that our opinion today should not be construed to prohibit Appellant from challenging any future action taken by the city that is inconsistent with this opinion.

### III. Illegal Exaction

Lastly, Appellant argues that when the City raised the user fees at its recreational facilities and pledged their proceeds to repay the bonds for the Presidential Park, an illegal exaction occurred. She argues that the increase in fees bears no relationship to the service provided, and that the fees are actually a tax that the City lacked the authority to impose without prior voter approval. We disagree.

"The distinction between a tax and a fee is that government imposes a tax for general revenue purposes, but a fee is imposed in the government's exercise of its police powers." *City of Marion v. Baioni*, 312 Ark. 423, 425, 850 S.W.2d 1, 2 (1993) (citing *City of North Little Rock v. Graham*, 278 Ark. 547, 647 S.W.2d 452 (1983)). A city may assess a fee for providing a service without obtaining public approval; however, a city cannot levy a tax unless it has received approval by the taxpayers. *Barnhart v. City of Fayetteville*, 321 Ark. 197, 900 S.W.2d 539 (1995) (citing Ark. Code Ann. § 26-73-103(a) (1987)). A governmental levy of a fee, in order not to be denominated a tax by the courts, must be fair and reasonable and bear a reasonable relationship to the benefits conferred on those receiving the services. *Id.*; *Baioni*, 312 Ark. 423, 850 S.W.2d 1. The fact that the ordinance labels the exaction a "fee," not a "tax," is not binding; rather, we look to the true character of the levy to determine whether it is a fee or a tax. *Id.*

Here, the chancellor found that the increase in user fees is fair and reasonable and bears a reasonable relationship to the benefits given to those who pay the fees. First, the chancellor found that only those persons who use the park facilities pay the fees. Thus, only those who directly benefit from using the park services are required to pay for those services. Second, the chancellor found that the improvement bonds secured by the user fees will be used to fund improvements to those parks, again benefitting those persons who use the park services. Third, the chancellor found that, similar

to the situation presented in *Baioni*, 312 Ark. 423, 850 S.W.2d 1, the fees will be deposited by the city into a separate enterprise fund used only for the benefit of its parks, not for general revenues.

Fourth, the chancellor found that the increases are fair and reasonable in light of the studies conducted by the city comparing its fees to those charged at similar facilities. The user fees for the fitness center were raised from $33.00 per month to $35.00 per month. In comparison, the fees for the YMCA were $46.00 per month, while those for a local gym were $90.00 per month. The fees for the city's zoo were raised from $3.00 to $5.00, after comparing the fees charged in other zoos in the southern region, such as Atlanta and Memphis. Lastly, the fees for eighteen holes of golf at the city's three courses were raised from $8.50 to $10.50 on weekdays, and from $10.50 to $12.50 on weekends. These fees were compared to those of $17.00 or $18.00 charged to play golf at the Country Club of Arkansas. The chancellor also noted that North Little Rock had similarly raised its user fees for its golf course at Burns Park. Accordingly, we cannot say that the chancellor erred in determining that the increase in user fees at the city's recreational facilities is fair and reasonable and bears a reasonable relationship to the benefits conferred on those persons who use the facilities. We thus affirm the chancellor's ruling on this issue.

GLAZE, J., concurs in part; dissents in part.

BROWN and IMBER, JJ., concur.

NORMAN MARK KLAPPENBACH, Spl. J., concurs.

THORNTON, J., not participating.

TOM GLAZE, Justice, concurring in part; dissenting in part. I agree in part and dissent in part with the majority opinion. The City of Little Rock agrees that Amendment 65 to the Arkansas Constitution prohibits the City from using monies from its general funds to pay the revenue bonds it authorized in order to acquire land for the William Jefferson Clinton Presidential Park. This is so because Amendment 65 and the Revenue Bond Act of 1987 clearly provide the bonds must be paid from revenues from sources *other than taxes* or assessments. Thus, unless the voters approved a tax to pay for the land in question, the City cannot use tax proceeds for such purpose. No such election or approval has occurred here. Significantly, the City's general fund is largely comprised of sales tax proceeds the voters approved for other purposes.

While the City agrees its general revenues cannot be pledged or used to pay the bonds it authorized here, it believes it can pledge user fees from its zoo, parks, and recreation facilities to secure payment of the bonds it authorized, and then replace those user fees with tax monies from its general funds to cover any deficit caused by the City's removal of the user fees for bond purposes. In other words, the City technically uses its monies labeled "user fees" to secure the revenue bonds it issued, but "tax proceeds" in turn replace the "user fees" to continue funding the City's zoo, parks, and recreational operations.[1] Obviously, the City's rearranging of its "user fees" and "tax monies" is designed to allow it to do indirectly what Amendment 65 forbids — employ tax monies to secure revenue bonds.

The majority opinion correctly reflects the City's attempt to circumvent the plain terms of Amendment 65, but it stops there. The opinion states that, while general funds or tax monies cannot be used to replace the user fees pledged to secure the revenue bonds, it is premature to so hold because it has not yet been shown if the City will be required to use its general or tax funds to offset the user fees pledged for revenue bond purposes. I disagree.

In oral argument, the City was asked repeatedly whether its general fund would be used to pay this increased deficit sustained by its zoo, .parks, and recreation facilities, and caused by the City redirecting the user fees revenue. The City implicitly and explicitly agreed in the responses it made in oral argument:

> City's counsel said, "[I] do not deny that the general fund will continue to support the parks department. . . ."

* * *

> City's counsel answered, "Right" to the question, "[You] are creating a tremendous deficit in the use or in the facilities such as the zoo, and the fitness center, and the golf courses, and you are going to have to make up that deficit with general revenues."

* * *

---

[1] The City covenanted to provide sufficient funds to insure the efficient operations and maintenance of these facilities.

After being asked, "If [the City] had not had the general revenues available to repay the user fees that were used to secure this bond, could the City have issued those bonds," the City's counsel said, "[I]f you are asking if, because of the use of the user fees, the [City] had to use general revenues to support a department such as the parks department in a manner that it didn't have to because it used to collect (sic) user fees, then I think the answer to that question is yes . . . as long as the [City] doesn't engage in deficit spending."

From the foregoing, the City was quite candid that general funds (containing tax monies) would be used to reimburse the user fees pledged to secure the revenue bonds. However, the City simply sees no wrong in switching or redirecting these funds. Instead, the City responds, stating it has always used general funds to make up deficits incurred by its programs; that is true, but Amendment 65 was not involved then and its programs' user fees were not being diverted to secure revenue bonds.

Obviously, general tax funds can be used to supplement the City's zoo, parks, and recreation programs, but those tax funds cannot indirectly be used to secure Amendment 65 revenue bonds. Unlike the conclusion reached by the majority opinion, the City's counsel's remarks reflect an honest assessment that general revenues must be used to improperly replace its user fees. The city manager, Cy Carney, acknowledged that past deficits in its programs, such as the zoo, golf courses, and fitness center, have been paid by the general fund. He further admitted pledges of user fees from these programs will create a need for additional revenues to make up those program deficits. Where will the City get those needed monies? Mr. Carney identified reducing the number of city employees. Of course, this would give the City additional revenues to spend from general funds, since such salaries are paid from those funds. Mr. Carney's answer merely confirms the source or revenue stream it looks to in order to pay the debts incurred by its programs. The City's evidence merely reveals the obvious — general revenues are and will continue to be those used to meet the City's increasing program deficits. For that reason, I would reverse the chancellor's decision.

In conclusion, although most can agree with the laudable objective intended by the City, the issue involved here transcends the lofty goal of acquiring land to construct a presidential library. If the City's redirecting of funds is permitted in these circumstances, a

new mechanism for municipal-deficit spending will have been approved for the first time in this state.[2]

In short, the mechanism designed by the City of Little Rock provides a creative means of using tax funds to aid in the financing of municipal capital improvements or other possible programs secured by Amendment 65 revenue bonds. Of course, if approved, other municipalities will surely follow suit in financing new projects, since no voter approval would be required. If the municipalities have sufficient revenues to underwrite such bonded indebtedness, *and* at the same time underwrite its ongoing programs, no problem would ensue. It is only when municipalities have limited revenues and cannot meet debt service *and* pay for its programs that financial trouble will occur. Someone then will be called to pay that debt. In those cases, new revenues must be found and likely that means taxpayers will be asked to approve a new tax.

ROBERT L. BROWN, Justice, concurring. I agree with the majority that park user fees from the zoo, fitness center, and golf courses can be pledged to retire the Clinton Presidential Park revenue bonds under Amendment 65. The second point raised by Ms. Harris is more difficult.

Lurking behind the whole issue of pledging park user fees to retire these revenue bonds is whether tax money in the form of the City's general fund is, in reality, paying off the bonds. A vote of the people is necessary when the general fund is obligated for bonded indebtedness. Both the City and Nora Harris agree that if the general fund is used for this purpose, this violates Amendment 65 and an election would be necessary. Where they disagree is on whether the shuffling of dollars by the City transforms the bond issue into one supported by tax dollars. City Attorney Tom Carpenter posited at oral argument before this court that any general fund subsidy was permissible. That is the critical issue raised by Ms. Harris.

---

[2] The City suggests a similar situation was involved in *Rankin v. City of Fort Smith*, 337 Ark. 599, 990 S.W.2d 535 (1999). However, in *Rankin*, Fort Smith issued revenue bonds to fund the building of a parking garage and the bonds were to be paid from revenues collected from the parking garage and meters. While taxpayer, Rankin, alleged Fort Smith used its general funds to pay the revenue bonds in violation of Amendment 65, the proof showed otherwise. In fact, the proof showed the parking facilities' revenues were sufficient to pay the debt service on the bonds.

Based on the record before us, this court cannot determine the extent to which the City's general fund is subsidizing the zoo, fitness center, and golf courses as a result of the pledge of user fees, if at all. Indeed, City Manager Cy Carney and City Parks Director Bryan Day adroitly skirted the issue when asked at the hearing on June 15, 1999, about the general fund subsidy. First, Mr. Carney:

> HARRIS ATTORNEY: Did you say, "All parks revenue including zoo admissions are pledged to the debt for the life of the bonds with the City board to review this year how to replace that money," did you say that?
>
> CARNEY: I believe I said something to that effect.
>
> HARRIS ATTORNEY: So how much money is the City board going to have to look for to replace in zoo, golf course and fitness center operations in order to meet the debt service?
>
> CARNEY: The City will have to either have additional revenue to replace that amount or reduce City operations to save dollars, in other words reduce expenses to the amount of each year's of debt service, principal and interest based on each year's schedule of payments.
>
> HARRIS ATTORNEY: Okay. What operations are you going to reduce in order to obtain the money to replace the funds from golf, zoo and fitness center revenues?
>
> MR. CARPENTER (CITY ATTORNEY): Objection. Calls for speculation of the witness and, also, this witness is not qualified to answer that question since it's a legislative question for the board of directors.
>
> ....
>
> HARRIS ATTORNEY: All right. Now, as I understand the process then, what savings you made in personnel and what savings you made with programs would make more money available to be applied to this money that's been pledged to the bond issue in order to keep the parks, the zoo, the golf course, those facilities operating. Is that correct?
>
> CARNEY: These actions I described would help me deliver to the city board a recommendation that would be a balanced budget for the year 2000, yes.

HARRIS ATTORNEY: But those savings would help, as you said, replace that money. Is that correct?

CARNEY: Replace lost revenues, yes.

HARRIS ATTORNEY: And the lost revenues being those pledged to the bond issue?

CARNEY: A part of lost revenues. Of course, there are other lost revenues in the City budget related to other items other than this particular bond issue.

Then, there was Mr. Day:

HARRIS ATTORNEY: So when you pledged the income from those facilities to something else other than this enterprise fund that helps cover the overhead out there, you automatically increase the general fund obligation to pay salaries, don't you?

MR. CARPENTER (CITY ATTORNEY): Objection, Your Honor, again it goes back to the speculation issue given Mr. Carney's testimony. We don't know, because it assumes that there will be no changes otherwise. The hypothetical is too broad. He says if we do this, this happens, and that assumes that there is a static, non-changing circumstance, and that's speculation.

THE COURT: Well, I believe the witness can answer. Overruled.

DAY: I'm sorry, would you repeat your question:

HARRIS ATTORNEY: Yes. When I pay the salaries for all of those people we talked about out of the general fund, and I take the revenue that's generated by their activities and I quit putting it in the general fund and I pledge it over someplace else, but I keep paying salaries, then I have increased the general fund expenditures for salary, because I don't have any revenue to offset it, haven't I?

DAY: As I understand the question, that is correct, yes.

HARRIS ATTORNEY: Pass the witness.

MR. CARPENTER (CITY ATTORNEY): May I ask from here, Your Honor?

THE COURT: Yes.

REDIRECT EXAMINATION

MR. CARPENTER (CITY ATTORNEY): And if you increase the fees again, then you have no impact on the general fund?

DAY: That is correct.

MR. CARPENTER (CITY ATTORNEY): Nothing further.

HARRIS ATTORNEY: Okay.

Ms. Harris offered no other proof to show that a general fund subsidy was occurring but merely relied on the City's future *projections* of needed revenue. We are bound by the record in this appeal and cannot go outside it. Until we know the answer to the subsidy question, we are simply jousting in the dark on whether Amendment 65 has been violated.

I write, however, to emphasize that the question of the general fund subsidy is left open for judicial determination at a later time. Stated differently, in my judgment the doctrine of *res judicata* would not foreclose future resolution of this point. My reason for concluding as I do is that the issue of the general fund subsidy could not have been litigated at the first trial because city officials (Mr. Carney and Mr. Day) never acknowledged that the general fund would subsidize the affected park facilities to the extent of the debt service and no other proof was offered by Ms. Harris on this point. Because this issue was not one that could have been decided in the first trial, *res judicata* does not prevent a later determination. *See Linn v. NationsBank*, 341 Ark. 57, 14 S.W.3d 500 (2000); *Baltz v. Security Bank of Paragould*, 272 Ark. 302, 613 S.W.2d 833 (1981).

The case of *Rankin v. City of Fort Smith*, 337 Ark. 599, 990 S.W.2d 535 (1999), bears some similarities to the facts in this case but does not meet the subsidy issue head on or resolve it. The *Rankin* case involved a commingling of garage fees, parking meter revenues, and general fund dollars in the Parking Facilities Fund which was used to pay off revenue bonds issued to build the parking garage. Garage fees and other parking fees were pledged to pay off the bonded indebtedness. The general fund was used to subsidize maintenance and operations at the parking garage. We held in that case that the general fund was not being used to pay the bond indebtedness directly because city financial statements showed that

the garage fees and other parking fees were sufficient to meet the debt service. The question never raised to, or addressed by, this court in *Rankin* was whether the general fund was being used indirectly to meet the bonds' debt service in light of the fact that tax dollars were replacing garage fees and parking revenues diverted from the maintenance and operation of that facility. That is the crucial issue that looms before us in the Nora Harris lawsuit and remains to be answered.

As the majority, Justice IMBER, and Special Justice KLAP-PENBACH all point out in their respective opinions, the overarching question in all this is how the city will fill the gaps in revenue at the zoo, fitness center, and golf course necessitated by the pledge of the user fees. The City has been shoring up operations significantly at these facilities with general fund dollars in recent years. It, therefore, stands to reason that any diversion of user fees which formerly had been used for the maintenance and operation of these facilities, would now have to be replaced, dollar-for-dollar, by the general fund. And if that indeed is the case, why is this not an example of the City doing indirectly what it could not do directly, as the majority opinion suggests? *See Gravett v. Villines*, 314 Ark. 320, 862 S.W.2d 260 (1993) (the Pulaski County Quorum Court could not transfer funding for running the county jail from the sheriff to the county judge and thus do indirectly what constitution prohibited it from doing directly); *Campbell v. Ford*, 244 Ark. 1141, 428 S.W.2d 262 (1968) (city cannot divert dedicated street to an unauthorized use by inaction when it could not do so by affirmative action).

In short, the interplay between the pledged user fees and the general fund subsidy was not sufficiently developed at trial for this court to make an informed decision. As the majority opinion correctly holds, it would require speculation on our part to reach this issue. For these reasons, I concur.

ANNABELLE CLINTON IMBER, Justice, concurring. I concur in the result but do so for different reasons than those expressed in the majority opinion.

This court's construction of Amendment 65 is of utmost importance because, as Section 4 of the Amendment states, "[t]his amendment *shall be the sole authority* required for the authorization, issuance, sale, execution and delivery of revenue bonds authorized hereby[.]" (Emphasis added.) The majority opinion interprets Amendment 65 to allow for the repayment of revenue bonds with rents, user fees, charges, or other revenues (other than tax revenues)

derived from the operations of "any governmental unit," including municipalities and their instrumentalities. The plain language of Amendment 65 lends itself to no other reading. Accordingly, I wholeheartedly agree with the majority's conclusion in Part I of the opinion that "the ordinance is in compliance with Amendment 65." However, I must disagree with Part II of the majority opinion which interprets Amendment 65 as prohibiting the use of general revenues to offset losses caused by pledging revenues from user fees to cover bond indebtedness:

> Because Amendment 65 forbids repaying revenue bonds with assessments from local improvements or taxes, *it correspondingly forbids pledging tax revenues to fill the gaps left by using other sources of monies to repay the bonds. In short, using tax revenues to offset losses caused by pledging revenues from user fees to cover bond indebtedness is indirectly using tax revenues to secure repayment of bonds, which is prohibited conduct.*

(Emphasis added.)

As the majority points out in Part I of the opinion, Amendment 65, by its broad and plain language, allows revenue bonds to be repaid with user fees or revenues derived from *the operations of any instrumentality of the City.* Nothing in the language of Amendment 65 limits the use of such revenues to (a) revenues that have never been produced before, or (b) revenues that exceed operating expenses. Indeed, the use of revenues derived from the operations of any governmental unit to repay revenue bonds will inevitably leave "gaps" in operating funds. The record in this case shows that in previous years, the City has subsidized the operations of its parks and recreational facilities with money from the City's general fund because those facilities do not generate sufficient revenues to support themselves. Although the City's authority to subsidize the operations of its parks and recreational facilities with general revenue funds is not questioned, the majority opinion would nonetheless require the City to refrain from increasing that subsidy by so much as one dime once the bonds are issued. These revenue bonds were issued in 1998. Thus, pursuant to the majority opinion, the City's subsidy of its parks and recreational facilities can never exceed the amount of the 1997 subsidy; that is, the maximum amount of the subsidy from the general fund will be frozen in time. Such a result is absurd because future subsidy increases may be necessitated by outside economic forces over which the City has no control, such as an increase in the minimum wage. Under the majority's reasoning, the City Board's hands will be tied from making the

financial decisions that it must make to account for such unforseen circumstances.

Furthermore, such an interpretation of Amendment 65 creates a moving target, whereby the constitutionality of this bond issue will depend upon how much money the City Board appropriates each year from the general fund to subsidize its parks and recreational facilities. The constitutionality may also depend upon the source of the revenue that the City Board appropriates each year.[1] However, the City Board's ability to increase the subsidy to its parks and recreational facilities by appropriating funds from sources other than tax revenues will also be limited by the majority's interpretation of Amendment 65 because tax revenues can never be used to offset losses caused by such an appropriation.

In effect, the majority has engrafted two words onto Amendment 65. Henceforth, the revenues that can be used to secure repayment of revenue bonds must be *new* revenues or *net* revenues. In the future, governmental units will rarely, if ever, be able to issue revenue bonds "for the purpose of financing all or a portion of the costs of capital improvements of a public nature ... and for such other public purposes as may be authorized by the General Assembly." Ark. Const. amend. 65, § 1.

I must also disagree with the majority's conclusion that our decision in *Rankin v. City of Fort Smith,* 337 Ark. 599, 990 S.W.2d 535 (1999), is not determinative of the issue at hand. The bond financing arrangement presented in *Rankin,* which we upheld, is no different than the one now before this court. In *Rankin,* the city issued revenue bonds to fund the building of a parking garage. In order to repay those bonds, the city pledged the revenues collected from *all* parking facilities owned and operated by the city, including those unrelated to the parking garage. *Id.* Therefore, just as in this case, the city was taking revenue from existing instrumentalities of the city in order to repay bonds for a new project. In addition to the revenue collected from the parking facilities, the City of Fort Smith paid over $500,000 from its general fund to the parking facilities fund between 1992 and 1996. *Id.* These general fund monies were specifically appropriated for use in the maintenance and operation of the facilities. *Id.* Again, like this case, the bond financing arrangement approved in *Rankin* left "gaps" in operating funds for

---

[1] The general fund includes revenue from a variety of sources, such as sales taxes, utility franchise fees, general property taxes, licenses and permits, and a large number of other miscellaneous sources.

the city's parking facilities. In upholding the appropriation of general funds in *Rankin*, we relied upon the undisputed proof that the parking facilities' revenue exceeded the bond debt service obligation. *Id.*

Likewise, the record in this case shows that the maximum payment required to meet principal and interest payments on these revenue bonds in any one year is $1,294,112.50 in the year 2002. The record also reveals that for the years 1988 through 1997, the last year for which there is a financial statement, the total annual revenue for the City's parks and recreational facilities was never less than $1,485,186, in 1988. Since that time, revenue has increased every year, with the exception of one, and, for the year 1997, revenue collections totaled $3,273,919. Clearly, revenue collections for the City's parks and recreational facilities have historically exceeded the debt service requirements on these revenue bonds, just as they did in *Rankin*. The burden of proof was on the appellant to show otherwise, which Ms. Harris failed to do. *Rankin v. City of Fort Smith, supra.*

Finally, we upheld the bond financing arrangement in *Rankin* despite a clause in the city's ordinance which stated:

> The City covenants and agrees that *it will own, operate and maintain a sufficient amount of parking facilities* and will fix and collect rates and charges for the use of all parking facilities ... including the increasing of the same from time to time ... *which shall be sufficient, together with other available funds,* to make the required deposits into the Bond Fund[.]

*Id.*, 337 Ark. at 601-02, 990 S.W.2d at 536 (emphasis added). That covenant is no different than the covenant at issue in this case in which the City agreed "to appropriate sufficient funds to insure the efficient operations and maintenance of the park and recreational activities of the City[.]"

I fear that the majority's construction of Amendment 65 in Part II of the opinion has entangled the political issues involved in this case with the legal issues presented to this court. It may be that the City Board made an unwise political decision in passing the ordinance in question, which divests the City's parks and recreational facilities of their revenue in order to finance the acquisition of land for the Presidential Park and fund capital improvements to the City's zoo and its three public golf courses. If the citizens of Little Rock disagree with that decision, political consequences will surely

follow. However, that is not for us to decide. We must only determine whether Amendment 65, as the sole authority for the revenue bonds at issue, allows the City Board to do what it has done here. I conclude that it does.

NORMAN MARK KLAPPENBACH, Special Justice, concurring. I concur with the majority's decision reached today and write to add other factors important to my decision to do so. The City seems to argue that Amendment 65 allows it to take existing user fees, pledge those fees to fund the financing of the revenue bonds and then use the general fund or other tax revenues to pay for maintenance and operations of the Zoo, Fitness Center and Golf Courses (enterprise fund) that were previously paid for with the user fees now pledged to retire the bonds. I find this argument unconvincing. This is clearly a case of the city attempting to do indirectly what it cannot do directly. It is hard to conceive that such a result is what the voters had in mind in passing Amendment 65. I agree with the majority's conclusion that Amendment 65 forbids pledging tax revenues to fill the gaps left by using the user fees to finance the bonds. To hold otherwise would make meaningless the provision in Amendment 65 that the funding for the bonds come from sources *other than assessments for local improvements and taxes* and would clearly dilute the taxpayer's rights to vote on tax increases. The record below reflects that the enterprise fund has traditionally been operated at a deficit and that deficit was funded from the general fund. Section 2 of Ordinance No. 17,690 requires that the city continue to provide sufficient funds to maintain the operation and maintenance of the enterprise fund:

> Furthermore, the City has covenanted in the Indenture, identified hereinafter to appropriate sufficient funds to insure the efficient operations and maintenance of the park and recreational activities of the City and does hereby affirm such covenant for purposes of this Ordinance.

The record further reflects that the City's Projected Pro Forma Financial Statements for the Recreation Services Fund anticipated the debt service on the bonds to be $1,756,015 for 2000, $1,763,454 for 2001, $1,761,125 for 2002, and $1,761,215 for 2003. The projected total expenses, not including debt service, for those years are: $3,977,676; $4,136,783; $4,302,254; and $4,474,344 respectively, while the projected required operating subsidies (Taking into account the debt service on the bonds) are expected to be $2,122,671; $2,144,203; $2,157,465; and $2,171,945 respectively. The operating subsidies required prior to

the issuance of the bonds were $780,147 (actual) for 1997, and $340,391 and $353,308 (projected) for 1998 and 1999 respectively. I find it difficult to buy the city's contention that projected deficits of this size can be made up by budget cuts and still maintain an efficient operation of the facilities. However, it was Appellant's burden to prove that the general fund and tax revenues would be used to fill the gaps left by using the user fees to finance the bonds, and I must agree with the majority that she did not meet that burden.

This conclusion is not inconsistent with the holding in Part I. While Amendment 65 and the applicable statutes allow for revenue bonds to be repaid from revenues from sources other than those financed (*i.e.*, revenues derived from any special fund or source other than assessments for local improvements and taxes or revenues), the funds used to finance the revenue bonds must come from either a new fee or an increase of a fee already in existence so that the use of those fees in funding the bond retirement does not cause general fund or other tax revenue to be used to replace those fees.