Dan Flowers, Director Arkansas Highway and Transportation Department P.O. Box 2261 Little Rock, AR 72203-2261
Dear Mr. Flowers:
I am writing in response to your request for my opinion on various questions relating to a proposal for partially financing the construction of an interstate highway through western Arkansas. You have provided the following background:
 The Federal Highway Administration (FHWA) has instituted an innovative finance program, the Transportation Infrastructure Finance and Innovation Act of 1998 of TIFIA, which allows the United States Department of Transportation to lend money to states, provided that the states support the loans with dedicated sources of revenue. A TIFIA loan can finance no more than thirty-three percent (33%) of the project. We note that 23 U.S.C. 183(c) provides for the repayment of TIFIA loans, and it, in pertinent parts, provides that payments may be deferred if the project is unable to generate sufficient revenues to meet the scheduled repayments of principle [sic] and interest on the secured loan. However, there are no provisions in the law allowing the Secretary of Transportation to forgive the loan. Along those lines, 23 U.S.C. 183(c)(4)(c) provides that any repayment of a deferred loan shall be contingent on the project meeting certain criteria and that the criteria shall include standards for reasonable assurances for repayment.
 It has been suggested that the Arkansas State Highway Commission borrow $225,000,000.00 under the TIFIA loan program. The proceeds from the loan will be used to partially finance construction of an interstate highway (Interstate 49) in Western Arkansas from the Arkansas-Louisiana line to the southern border of Missouri. It was further suggested that the highway be operated as a toll road and that the TIFIA loan be secured by the toll revenue.
 Although the TIFIA loan is a part of the Federal Innovative Finance Program, the borrowing of the money and pledging the toll revenue present the following questions which I pose and respectfully request your opinion:
 (1) May the Arkansas State Highway Commission borrow money from the U.S. Department of Transportation and pledge toll revenue from the highway project to secure the federal loan without violating Amendment 20 of the Arkansas Constitution?
 (2) Does the definition of "bonds" set forth in Ark. Code Ann. § 19-9-604(1) apply to a pledge of toll revenue to secure a TIFIA loan?
 (3) If the Commission can pledge toll revenue to secure a TIFIA loan, may it do so without issuing revenue bonds and following the procedure set forth in Ark. Code Ann. §§ 19-9-601 through — 607?
 (4) Given the fact that the United States Department of Transportation may require the State of Arkansas to provide revenue sources other than proceeds from tolls, including "revenues of the State," may the Commission receive a TIFIA loan and secure same without a vote of the people?
RESPONSE
In response to your first question, I believe that so long as the state does not incur a conditional obligation to repay a toll-secured TIFIA loan using assessments for local improvements or taxes, the state need not obtain voter approval of the loan pursuant to Amendment 20. With respect to your second question, I believe the statutory definition of "bonds" would apply only if the TIFIA loan were non-recourse — i.e., if the parties agreed that the anticipated toll revenues or other non-tax-based dedicated revenues would constitute the only source for repayment. With respect to your third question, I believe the evidences of indebtedness associated with a TIFIA loan would qualify as "revenue bonds" under Amendment 65 so long as the revenues dedicated for repayment derived from the project or improvement financed by the bonds (e.g.,
tolls), the operations of a governmental unit, or any other special fund or source other than assessments for local improvement taxes. If the loan documents qualify as "revenue bonds" under this definition, I believe the procedural requirements set forth at A.C.A. §§ 19-9-601 through -607 will apply. The answer to your fourth question will depend on the nature of the "revenue sources other than proceeds from tolls." As suggested above, any pledge of tax revenues or the state's faith or credit will trigger the voter-approval requirement set forth in Amendment 20.
Question 1: May the Arkansas State Highway Commission borrow money fromthe U.S. Department of Transportation and pledge toll revenue from thehighway project to secure the federal loan without violating Amendment 20of the Arkansas Constitution?
Amendment 20 to the Arkansas Constitution provides in pertinent part:
 Bonds prohibited except when approved by majority vote of electors. — Except for the purpose of refunding the existing outstanding indebtedness of the State and for assuming and refunding valid outstanding road improvement district bonds, the State of Arkansas shall issue no bonds or other evidence of indebtedness pledging the faith and credit of the State or any of its revenues for any purpose whatsoever, except by and with the consent of the majority of the qualified electors of the State voting on the question at a general election or at a special election called for that purpose.
This provision of the Arkansas Constitution must be read in conjunction with Ark. Const. amend. 65, which authorizes the issuance of revenue bonds without a vote of the people. Subsection 3(a) of Amendment 65 defines the term "revenue bonds" as follows:
 The term "revenue bonds" as used herein shall mean all bonds, notes, certificates or other instruments or evidences of indebtedness the repayment of which is secured by rents, user fees, charges, or other revenues (other than assessments for local improvements and taxes) derived from the project or improvements financed in whole or in part by such bonds, notes, certificates or other instruments or evidences of indebtedness, from the operations of any governmental unit, or from any other special fund or source other than assessments for local improvements and taxes.
The Revenue Bond Act of 1987, A.C.A. § 19-9-601 et seq., the enabling legislation for Amendment 65, further defines the term "revenue bonds" as "all bonds or other obligations, the repayment of which are secured by rents, loan payments, user fees, charges, or other revenues derived from any special fund or source other than assessments for local improvements and taxes. . . ." A.C.A. § 19-9-604(1). The Arkansas Supreme Court has recently declared that pursuant to these laws "revenue bonds may be repaid with rents, user fees, charges, or other revenues, other than tax revenues, derived from three sources: (1) the project or improvement financed by the bonds; (2) the operations of any governmental unit;[1]
or (3) any other special fund or source other than assessments for local improvement and taxes." Harris v. City of Little Rock, 344 Ark. 95, 100, ___ S.W.3d ___ (2001).
Amendment 20 prohibits the state from pledging its faith and credit or revenues to repay a loan without voter approval. Amendment 65 provides that "any governmental unit" may issue "revenue bonds" — instruments not secured by the faith and credit or tax revenues of the state — to finance capital improvements with or without voter approval. Ark. Const. amend.65, § 1. I gather from your request that you are asking whether the state may enter into a TIFIA loan without first obtaining voter approval. The question, then, is whether the debt instruments evidencing a TIFIA loan would qualify as "revenue bonds."
What strikes me at the outset is the breadth of Amendment 65's definition of the term "bond," which includes any instrument or evidence of indebtedness to be discharged from one of the three sources listed inHarris. In my opinion, assuming the terms of repayment fall within one of the three Harris categories, the documents evincing the indebtedness would clearly qualify as "revenue bonds."
You have very accurately summarized in your request the provisions of TIFIA that generate concern regarding the source of funds used to repay the loan. Subsection 183(c)(3) of title 23 of the United States Code, captioned "Sources of repayment funds," provides: "The sources of funds for scheduled loan repayments under this section shall include tolls, user fees, or other dedicated revenue sources." (Emphasis added.) Seealso 49 C.F.R. § 80.13(a)(4) ("Project financing shall be repayable, in whole or in part, from tolls, user fees or other dedicated revenue sources."). As you acknowledge, no provision of TIFIA authorizes the Department of Transportation to forgive any portion of the loan, and 23 U.S.C. §§ 183(c)(4)(C)(I) and (ii) provide that any deferment of repayment must be conditioned on a project meeting specific criteria that "shall include standards for reasonable assurance of repayment." Assuming, then, that tolls and user fees prove inadequate to discharge a debt, the question arises whether the federal government would seek to recover the deficiency from general state revenues. The answer to this question will obviously depend on the specific terms of the debt instruments, which will detail the federal government's remedies in the event of default. However, the question remains whether the federal government is authorized under TIFIA and related regulations to enter into a non-recourse loan agreement secured solely by toll revenues.
I believe this question should be answered in the affirmative. Section 23(c)(3) of title 23 of the United States Code, captioned "Sources of repayment funds," provides: "The sources of funds for scheduled loan repayments under this section shall include tolls, user fees, or other dedicated revenue sources." Even acknowledging the fact that the term "include" may not be exhaustive, this statute suggests that the government will not look beyond the dedicated collateral for repayment in the event of a default. This impression is reinforced by49 C.F.R. § 80.15(a)(2), which assigns as one weighted criterion in selecting TIFIA loan projects "[t]he creditworthiness of the project, including a determination by the Secretary that any financing for the project has appropriate security features, such as a rate covenant,[2]
to ensure repayment." Section 80.21 of title 49 of the Code of Federal Regulations further provides:
 The DOT will not apply an administrative offset to recover any losses to the Federal Government resulting from project risk the DOT has assumed under a TIFIA credit instrument. The DOT may, however, use an administrative offset in cases of fraud, misrepresentation, false claims, or similar criminal acts or acts of malfeasance or wrongdoing.
This regulation dictates that, absent misconduct on the part of the project sponsor, the federal government will look only to its dedicated collateral to recover its losses in the event of a default. This suggestion is, in turn, reinforced by the provisions of the Federal Credit Reform Act of 1990 ("FRCA"), 2 U.S.C. 661 through 661f, which provides for an annual federal subsidy to TIFIA to cover the costs of anticipated defaults. The nature of this subsidy is explained in Section 2-4 of the TIFIA Program Guide:
 The FRCA requires that prior to providing TIFIA credit assistance, the DOT establish a capital reserve, or "subsidy amount," to cover expected credit losses.
 Congress has placed dual controls on the amount of annual TIFIA funding available. First, the TIFIA program has a limit on the total annual subsidy amount available (i.e., the amount of federal funding, or "budget authority," available to cover the expected credit losses associated with the provision of credit instruments that year, net of any fee income).[3] This amount may be reduced annually by appropriations legislation. Second, there is a limit on the annual credit assistance amount (i.e., the principal amount that may be committed in the form of direct loans, guaranteed loans, and lines of credit). This amount is not affected by annual appropriations legislation. While the annual subsidy amount remains available for obligation in subsequent years if not used, the annual credit amount expires at the end of each fiscal year; it is not available in subsequent years if not used by the end of the fiscal year for which it is authorized.
The provision of this federal subsidy to cover expected losses from project defaults likewise suggests that TIFIA will not seek recourse beyond dedicated collateral from a project sponsor in the event of a default.
My own inquiries reveal that TIFIA administrators indeed interpret the applicable legislation and regulations as authorizing them to structure non-recourse loans for highway construction in which the collateral consists exclusively of toll revenues. In my opinion, if the state were to negotiate such a loan, the loan instruments would constitute "revenue bonds" as defined in Amendment 65 and at A.C.A. § 19-9-604(1), in which case the voter-approval requirement set forth in Amendment 20 would not apply. However, I must stress that the negotiated terms of the loan will control, rendering it impossible for me to answer your question at this point. In my estimation, the mere fact that the federal government will have recourse only to "dedicated revenues" does not mean that the loan instruments will necessarily constitute "revenue bonds" under Amendment 65. For instance, the regulations provide that "the Secretary may accept general obligation pledges or general corporate promissory pledges and will determine the acceptability of other pledges and forms of collateral as dedicated revenue sources on a case-by-case basis."49 C.F.R. § 80.13(c). It seems clear that a general obligation pledge, even if characterized as "dedicated," would remain a pledge of tax revenues, not "some special fund or source other than assessments for local improvement and taxes." Because offering such collateral would entail "pledging the faith and credit of the State or any of its revenues," I believe such an arrangement would violate Ark. Const. amend.20 unless approved by a vote of the people. The specific terms of the proposed loan will consequently determine whether the electorate must approve the loan.
Question 2: Does the definition of "bonds" set forth in Ark. Code Ann. §19-9-604(1) apply to a pledge of toll revenue to secure a TIFIA loan?
As previously noted, A.C.A. § 19-9-604(1) defines "bonds" or "revenue bonds" as instruments issued pursuant to Amendment 65 comprising "all bonds or other obligations, the repayment of which are secured by rents, loan payments, user fees, charges, or other revenues derived from any special fund or source other than assessments for local improvements and taxes. . . ." In my opinion, this definition would apply to a pledge of toll revenue as security for a TIFIA loan only if taxes or assessments for local improvements were expressly excluded as a potential source of repayment in the event the collateral proved insufficient to discharge the debt.
Question 3: If the Commission can pledge toll revenue to secure a TIFIAloan, may it do so without issuing revenue bonds and following theprocedure set forth in Ark. Code Ann. §§ 19-9-601 through -607?
Sections 19-9-601 through -607 of the Code set forth the procedure for issuing revenue bonds pursuant to Amendment 65, including provisions for public notice and a public hearing. As reflected in my response to your first two questions, I believe the debt obligations attending a TIFIA loan would qualify as "revenue bonds" if the loan were non-recourse and secured only by toll revenues or some other source of funding falling within one or more of the three categories of income described inHarris. Assuming this were the case, I believe the loan documents themselves would constitute revenue bonds. The "governing body" of a "governmental unit" can authorize the issuance of revenue bonds "by proclamation, order, ordinance, or resolution clearly stating the principal amount of and the purpose or purpose for which the bonds are to be issued." A.C.A. § 19-9-606. With respect to bonds issued by the state or its agencies, the term "governing body" denotes the governor. A.C.A. §§ 19-9-604(4)(A) and (5)(A). However, before authorizing the loan contract, I believe the governor must provide the public notice and conduct the public hearing described at A.C.A. § 19-9-607.
Question 4: Given the fact that the United States Department ofTransportation may require the State of Arkansas to provide revenuesources other than proceeds from tolls, including "revenues of theState," may the Commission receive a TIFIA loan and secure same without avote of the people?
As reflected in the foregoing discussion, I believe that if the state plans to pledge taxes or its general faith and credit to secure the loan, Amendment 20 dictates that the people approve the transaction. SeeHarris, 344 Ark. at 109 ("Because Amendment 65 forbids repaying revenue bonds with assessments from local improvements or taxes, it correspondingly forbids pledging tax revenues to fill the gaps left by using other sources of monies to repay the bonds."). By contrast, if the loan is non-recourse and the dedicated collateral is limited to funds that fall within one of the three Harris categories, I believe the governor can authorize the transaction following public notice and a public hearing.
Assistant Attorney General Jack H. Druff prepared the foregoing opinion, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:JHD/cyh
[1] Subsection 3(b) of Amendment 65 defines a "governmental unit" as "the State of Arkansas; any county, municipality, or other political subdivision of the State of Arkansas; any special assessment or taxing district established under the State of Arkansas; and any agency, board, commission, or instrumentality of any of the foregoing." This definition clearly includes the Highway Commission.
[2] Such a covenant would presumably provide for an increase in the toll in the event toll revenues prove insufficient to service the debt.
[3] The Code of Federal Regulations defines the term "subsidy amount" as follows:
 Subsidy amount means the amount of budget authority sufficient to cover the estimated long-term cost to the Federal Government of a Federal credit instrument, calculated on a net present value basis, excluding administrative costs and any incidental effects on governmental receipts or outlays in accordance with the provisions of the Federal Credit Reform Act of 1990 (2 U.S.C. 661 et seq.).
49 C.F.R. § 80.3.