The Honorable Paul Weaver State Representative P.O. Box 33 Violet Hill, AR 72584-0033
Dear Representative Weaver:
I am writing in response to your request, made on behalf of a constituent, for my opinion regarding the legality of Horseshoe Bend City Ordinance No. 2001-02. Your constituent has supplied a copy of the ordinance, dated March 26, 2001, which authorizes the city's mayor and recorder/treasurer to negotiate on behalf of the city lease-purchase and other varieties of financing agreements with the Arkansas Soil and Water Conservation Commission (the "Commission"), not to exceed $363,123.71 in principal value at any given time, for the purpose of constructing a new water well to serve city residents. Section 1 of the ordinance affords the designated officers the following pertinent powers:
* * *
 (B) To obligate the Lessee [Horseshoe Bend] to pay such lease rates, rents, or rates of interest as such Officers shall deem proper.
 (C) To obligate the Lessee to such other terms and conditions as the Officers shall deem proper.
* * *
 (E) To pledge, grant a security interest or lien in, or assign property of the Lessee or property of others on which it is entitled to borrow, any kind and in any amount as security for any or all obligations (past, present, and/or future) of the Lessee to the Commission.
In correspondence to you, your constituent has further provided a brief summary of events, referencing various enclosures that were not included among the materials provided this office. I gather from the summary that, despite concerns expressed by your constituent and a city alderman, at some point after March 15, 1999, the city borrowed money from the Commission and proceeded to drill the well. It appears that your constituent does not possess a copy of the contract, since he merely speculates that the term for repayment of the loan is 30 years, although I have very recently obtained a copy that confirms his suspicion. Against this backdrop, your constituent has posed a question I will paraphrase as follows:
 Given the restrictions of A.C.A. § 14-234-104, may the city council of Horseshoe Bend, a city of the second class, by ordinance authorize its mayor and treasurer/recorder" jointly and severally" to enter into an interest-bearing secured loan contract with the Commission for the purpose of financing improvements to a municipal well, with repayment to occur over a period of 30 years?
RESPONSE
As a general proposition, I do not believe A.C.A. § 14-234-104 precludes the city council from entering into a long-term financing agreement with the Commission to fund the drilling of a public well, provided that the city does not pledge its general credit or tax-based revenues to repay the loan. If the city pledges its full faith and credit or tax-financed municipal assets as security for the loan, I believe the loan will offend the provisions of Ark. Const. arts. 12, § 4, and 16, § 1. Moreover, I do not believe the city council can delegate to the designated officers the discretionary power to enter into such an agreement.
As the court observed in Harris v. City of Little Rock, 344 Ark. 95,104, 40 S.W.3d 214 (2001):
 [A]n ordinance is entitled to the same presumption of validity that legislative enactments receive. Lawrence v. Jones, 228 Ark. 1136, 313 S.W.2d 228 (1958) (citing Delony v. Rucker, 227 Ark. 869, 302 S.W.2d 287 (1957)). Thus, similar to a statute, an ordinance is presumed constitutional, and the burden of proving otherwise is upon the challenging party. See Craft v. City of Fort Smith, 335 Ark. 417, 984 S.W.2d 22 (1998); Laudan v. State, 322 Ark. 58, 907 S.W.2d 131 (1995); Board of Adjustment of Fayetteville v. Osage Oil Transp., Inc., 258 Ark. 91, 522 S.W.2d 836, cert. denied, 423 U.S. 941 (1975).
The presumption that a statute — and, by extension, an ordinance — is constitutional is quite strong. As the Supreme Court noted in Hamiltonv. Jeffrey Stone Company, 25 Ark. App. 66, 69, 752 S.W.2d 288 (1988):
 In approaching questions pertaining to the constitutionality of legislative acts, it is appropriate to keep in mind basic principles regarding the presumptions and burdens of proof involved. It is well settled that before an act may be struck down as unconstitutional, it must clearly appear that the act is at variance with the Constitution. Handy Dan Improvement Center, Inc. v. Adams, 276 Ark. 268, 633 S.W.2d 699 (1982). There is a presumption of constitutionality attendant to every legislative enactment, and all doubt concerning an act must be resolved in favor of constitutionality. Holland v. Willis, 293 Ark. 518, 739 S.W.2d 529 (1987). If it is possible for the courts to construe an act so that it will meet the test of constitutionality, they not only may, but should and will do so. Davis v. Cox, 268 Ark. 78, 593 S.W.2d 180 (1980). Also, the party challenging a statute has the burden of proving it unconstitutional. The Citizens Bank of Batesville v. Estate of Pettyjohn, 282 Ark. 222, 667 S.W.2d 657
(1984).
Your constituent has questioned whether Ordinance No. 2001-02 is valid given the terms of A.C.A. § 14-234-104, which provides:
 (a) Any municipality owning or operating a waterworks system, however constructed or acquired, and desiring to construct improvements and betterments thereto, may borrow money to be used for those purposes, to refinance or retire existing indebtedness related to the waterworks system, or to provide funds for preliminary expenses prior to the issuance of revenue bonds, the loan to be evidenced by revenue promissory notes as set out in this section. The money so borrowed shall be deposited in a revenue note fund and shall be used solely for the purposes authorized in this section.
 (b) The note or notes evidencing the loan shall be authorized by the legislative body of the municipality and shall be due in no more than five (5) years from date and shall bear interest at a rate or rates as shall be provided in the ordinance authorizing their issuance, interest payable semiannually.
 (c)(1) The note or notes shall be payable solely from the revenues derived from the waterworks system and shall not in any event constitute an indebtedness of the municipality within the meaning of the constitutional provisions or limitations.
 (2) It shall be plainly stated on the face of each note that it has been issued under the provisions of this act and that it does not constitute an indebtedness of the municipality within any constitutional or statutory limitations.
 (d) The note or notes shall be subordinate to any outstanding revenue bonds theretofore issued by the municipality.
 (e) It shall be no objection to the subsequent issue of any revenue bonds that a portion of the proceeds received from the sale of the revenue bonds is to be used to retire the indebtedness permitted by this section. If the proceeds of the bonds are so used, then the improvements constructed or purchased with the proceeds of the loan authorized by this section shall be considered to be a portion of the improvements constructed or purchased with the revenue bonds subsequently issued and shall be subject to the lien of the bonds.
 (f) All interest paid on the revenue bonds shall be exempt from State of Arkansas income tax.
Subsection (a) of the statute authorizes the issuance of revenue notes for any of three purposes: (1) to finance the construction of "improvements and betterments" to a waterworks system; (2) to refinance or retire debt incurred for waterworks improvements; or (3) or to defray preliminary expenses prior to the issuance of revenue bonds devoted to effecting waterworks improvements. The statute expressly dictates that the debt evidenced by the revenue notes have a maturity date of 5 years or fewer and that the enabling ordinance recite the applicable interest rate. As reflected in subsections (a) and (e) of the statute, in the event the note is not itself used to finance the improvements, the borrower remains free to finance the project by issuing revenue bonds as provided by law.
Your constituent is apparently concerned that Ordinance 2001-02 recites no interest rate and does not require that any financing agreement negotiated thereunder be restricted to a term of 5 years at maximum. However, this concern appears to reflect a mistaken assumption that a municipality may borrow money to improve its waterworks only under the provisions of A.C.A. § 14-234-104 — an assumption inconsistent with the terms of the statute itself, which acknowledges that the municipality may elect to finance improvements through a separate issuance of revenue bonds. As discussed below, any such alternative borrowing is neither constitutionally nor statutorily restricted to the 5-year term your constituent apparently feels must apply.
In characterizing A.C.A. § 14-234-104 as an exclusive means of financing, your constituent ignores the subsequently enacted Water, Sewer, and Solid Waste Management Systems Finance Act of 1975 (the "1975 Act"), codified at A.C.A. § 14-230-101 et seq., which sets forth a totally distinct means whereby a municipality might finance waterworks improvements. The 1975 Act specifically defines a city as an "eligible applicant," A.C.A. § 14-230-102(1), authorized to seek the statutorily authorized financing from the Commission, A.C.A. §§ 14-230-102(2) and14-230-106(a). Section 14-230-105 of the Code further provides:
 (a) The commission is authorized to make loans and grants to provide funds for water, sewer, or solid waste management financial assistance.
 (b) The commission may provide financial assistance up to the total project cost for water, sewer, or solid waste management systems projects.
Finally, A.C.A. § 14-230-109 provides in pertinent part:
 (a) A special fund, entitled the "Water, Sewer and Solid Waste Systems Revolving Fund," is created to provide a depository for funds which may be appropriated or otherwise secured.
 (b) The revolving fund shall be used to provide low interest loans or grants to an eligible applicant for the purposes established in this chapter. Funds from the repayment of loans made under this chapter shall return to the revolving fund and shall be reused in a manner which is consistent with the purposes of this chapter.
 (c) The commission is authorized to use the funds made available under this chapter for grants to or for suspended repayment of loans to eligible applicants.
 (d) Special terms for repayment of loans, including a negotiated schedule of repayment that reasonably minimizes the user charges and tax burden upon customers of an eligible applicant, may be negotiated by the commission and concluded by contractual agreement. Repayment of loans not exceeding a fifty-year period is authorized.
Nothing in the Act dictates that an ordinance authorizing city officers to contract with the Commission take any particular form.
Your constituent should further be aware that there exists yet another statutory authorization for a municipality to incur long-term debt to effect improvements to municipal waterworks. Like the current version of A.C.A. § 14-234-104, Act No. 321 of 1955, § 5 provided for the issuance of 5-year revenue notes to finance either capital improvements to municipal waterworks or preliminary expenses. However, Section 4 of Act 321 separately addressed borrowing to finance capital improvements to municipal waterworks. This section, which amended Act No. 131 of 1933, § 10, provided that capital improvements to municipal waterworks might be financed in the same manner as the initial capital construction — viz., through the issuance of 20-year bonds. See Act No. 131 of 1933, § 3. This alternative means of long-term financing is currently codified at A.C.A. §§ 14-234-205 and -212, which authorize a municipality to finance waterworks improvements by issuing revenue bonds maturing over a term up to 40 years.
Your constituent may likewise be unaware that the Arkansas Water Resources Development Act of 1981 (the "1981 Act"), codified at A.C.A. §§15-22-601 through -622 (Repl. 2000), independently authorizes the Commission to finance qualified water resource projects by issuing State Water Resources Development General Obligation Bonds having a maturity date up to 30 years. In reviewing a recently obtained copy of the lease-purchase agreement referenced in your request, I noted that the parties to the contract recited this legislation as authorizing their agreement, which provides that the Commission will purchase existing waterworks facilities with bond revenues, the city will effect the improvements with those revenues and the commission will then lease the property back to the city under a lease-purchase agreement over the 30-year term of the bonds at a rental that will retire the bonds and discharge the state's expenses.
The question initially arises whether this arrangement constitutes an actual lease or a conditional sales contract subject to an interest provision — i.e., a loan. If it is the latter — a determination only a finder of fact can make — a reviewing court will need to address various constitutional issues.
In the attached Ark. Op. Att'y Gen. No. 94-082, my predecessor considered whether a municipality might borrow money from the Arkansas Highway and Transportation Department and repay the loan over a period of years. As my predecessor noted, the question of municipal borrowing implicates several provisions of the Arkansas Constitution, including Ark. Const. art. 12, § 4, which provides in pertinent part:
 No municipal corporation shall be authorized to pass any law contrary to the general laws of the state; . . . nor shall any mayor, city clerk or recorder, or any other officer or officers, however designated, of any city of the first or second class or incorporated town sign or issue scrip, warrant or other certificate of indebtedness of [sic] excess of the revenue from all sources for the current fiscal year.
* * *
 Where the annual report of any city or county in the State of Arkansas shows that scrip, warrants, or other certificate of indebtedness had been issued in excess of the total revenue for that year, the officer or officers of the county or city or incorporated town who authorized, signed or issued such scrip, warrants or other certificates of indebtedness shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined in any sum not less than five hundred dollars nor more than ten thousand dollars, and shall be removed from office.
Section 1 of Article 16 further provides:
 Neither the State nor any city, county, town or other municipality in this State shall ever lend its credit for any purpose whatever; nor shall any county, city or town or municipality ever issue any interest bearing evidences of indebtedness, except such bonds as may be authorized by law to provide for and secure the payment of the indebtedness existing at the time of the adoption of the Constitution of 1874, and the State shall never issue any interest-bearing treasury warrants or scrip.
These provisions are qualified by several constitutional amendments. Amendment 62 authorizes the legislative body of any municipality," with the consent of a majority of the qualified electors voting on the question at an election called for that purpose," to authorize the issuance of interest-bearing bonds to finance municipal improvements. Amendment 65 further provides in pertinent part:
 1. Any governmental unit, pursuant to laws heretofore or hereafter adopted by the General Assembly, may issue revenue bonds for the purpose of financing all or a portion of the costs of capital improvements of a public nature, facilities for the securing and developing of industry or agriculture, and for such other public purposes as may be authorized by the General Assembly.[1] Such bonds may bear such terms, be issued in such manner, and be subject to such conditions, all as may be authorized by the General Assembly; and the General Assembly may, but shall not be required to, condition the issuance of such bonds upon an election.
* * *
3. Definitions.
 (a) The term "revenue bonds" as used herein shall mean all bonds, notes, certificates or other instruments or evidences of indebtedness the repayment of which is secured by rents, user fees, charges, or other revenues (other than assessments for local improvements and taxes) derived from the project or improvements financed in whole or in part by such bonds, notes, certificates or other instruments or evidences of indebtedness, from the operations of any governmental unit, or from any other special fund or source other than assessments for local improvements and taxes.
 (b) The term "governmental unit" as used herein shall mean the State of Arkansas; any county, municipality, or other political subdivision of the State of Arkansas; any special assessment or taxing district established under the laws of the State of Arkansas; and any agency, board, commission, or instrumentality of any of the foregoing.
In Harris, the court summarized the substance of Amendment 65 as follows:
 It is clear from the plain language of Amendment 65 . . . that revenue bonds may be repaid with rents, user fees, charges, or other revenues, other than tax revenues, derived from three sources: (1) the project or improvement financed by the bonds; (2) the operations of any governmental unit; or (3) any other special fund or source other than assessments for local improvement and taxes.
344 Ark. at 100-01. Only a finder of fact can determine whether any particular debt instrument constitutes a "revenue bond" under this extremely broad definition.[2]
Finally, the recently adopted Ark. Const. amend. 78 provides in pertinent part:
 Section 2.(a) For the purpose of acquiring, constructing, installing or renting real property or tangible personal property having an expected useful life of more than one (1) year, municipalities and counties may incur short-term financing obligations maturing over a period of, or having a term not to exceed[,] five (5) years.
Subsection 2(a)(2) of the amendment expressly provides that annual principal and interest on outstanding obligations incurred pursuant to this provision "shall be charged against and paid from the general revenues for such fiscal year."[3] Insofar as Amendment 78 does not require that the financing be by revenue note, it broadens the range of permissible financing of loans for improvements of the sort that fall within its ambit.
Both Ark. Const. amend. 78 and A.C.A. § 14-234-104 authorize a municipality to incur only interest-bearing indebtedness that will mature in 5 years or fewer, and A.C.A. § 14-234-104 dictates that any debt incurred under its authority only be in the form of a revenue note. The ordinance at issue appears to be authorize the municipality to incur interest-bearing indebtedness that contains no such temporal restriction. Moreover, the ordinance does not require that the contemplated indebtedness be subject to a vote of the people in accordance with Ark. Const. amend. 62, which allows debt-financed public improvements approved by the public.
However, Ark. Const. amend. 65, which authorizes the issuance of interest-bearing revenue bonds to finance municipal improvements, imposes no such temporal restriction on repayment and does not condition the issuance of revenue bonds on a favorable vote of the people. Amendment 65 consequently appears to validate the temporal provision of the 1975 Act, which authorizes the issuance of low-interest loans for municipal water improvement to be repaid over any period up to 50 years.[4] A.C.A. §14-230-109. Moreover, in my opinion, Amendment 65 might well further validate a 30-year lease-purchase by a municipality of a project financed by 30-year state bonded indebtedness. The 1981 Act clearly anticipates that the Commission might lease or sell a waterworks resources project to the municipality served by the project. A.C.A. § 15-22-604(8). Consequently, to the extent the lease-purchase agreement qualifies as a loan, see discussion infra, the 1981 Act appears to qualify as legislation enabling Amendment 65 by authorizing municipalities to borrow money over a 30-year term so long as only user fees, as opposed to general tax revenues, are pledged for repayment.[5]
To summarize the foregoing, the Code contains four alternative mechanisms for financing capital improvements to municipal waterworks: the issuance of a revenue notes for a term up to 5 years pursuant to A.C.A. §14-234-104; the issuance of a revenue note in the form of a lease-purchase agreement pursuant to the 1981 Act for a term up to 30 years; the issuance of municipal revenue bonds for a term up to 40 years pursuant to A.C.A. §§ 14-234-205 and — 212; and the issuance of a promissory note to the Commission pursuant to the 1975 Act for a term up to 50 years. In my opinion, Ark. Const. amend. 65 authorizes a municipality to finance waterworks improvements in any of these four ways so long as it does not pledge its general credit, tax revenues or tax-financed assets as security for repayment. In addition, I believe Ark. Const. amend. 78 further authorizes a municipality to secure a 5-year note for such improvements with a pledge of its general credit. I see no tension among these alternatives. In response to your constituent's specific question, then, if the debt instruments authorized in Ordinance No. 2001-02 might be restricted to the broadly defined category of "revenue bonds," absent some other constitutional objection (e.g., an unlawful delegation of authority to contract of the sort discussed below), the ordinance itself, if not necessarily the contract negotiated on its authority, should be deemed to pass constitutional muster.
Although the ordinance purports to authorize the designated officials to obtain any variety of interest-bearing financing from the Commission, it is significant that the ordinance specifically references a lease-purchase agreement and denominates the City of Horseshoe Bend as "Lessee." I am not a finder of fact and cannot speculate whether the approved financing is in any sense restricted. However, I can and will opine that, so long as only user fees are pledged as payment, a lease-purchase agreement might qualify as a revenue bond under the expansive definition set forth at Ark. Const. amend. 65 § 3(a).
I offer this opinion notwithstanding the fact that in Brown v. City ofStuttgart, 312 Ark. 97, 847 S.W.2d 710 (1993), the court, invoking Ark. Const. art. 16, § 1, characterized as an impermissible "interest bearing evidence of indebtedness" an agreement for the lease-purchase of a municipal garbage truck. In support of this conclusion, the court remarked that if the city elected in any given year not to appropriate funds for the lease-purchase — an option that would effectively cancel the contract — the city would lose accumulated equity and interest. Id.
At 100. However, I believe the lease-purchase agreement in Brown is potentially distinguishable from one that calls for repayment from income generated exclusively from the project itself or from one of the other permissible sources recited in Harris, supra. As my immediate predecessor noted in discussing Brown:
 The entire analysis of such a contract changes . . . if the contract and the payments to be made under the lease-purchase agreement . . . are made not from tax dollars, but from "rents, user fees, charges, or other revenues (other than assessments for local improvements and taxes) derived from the project or improvements financed in whole or in part by such bonds, notes, certificates or other instruments or evidences of indebtedness, from the operation of any governmental unit, or from any other special fund or source other than assessments for local improvements or taxes." Arkansas Constitution Amendment 65, 3(a). In the latter case, this office has previously concluded, although there are as of yet no judicial decisions on point, that a lease-purchase agreement could be structured as a "revenue bond" under Amendment 65 to the Arkansas Constitution. See Op. Att'y Gen. 90-067
(copy enclosed). The definition of "revenue bonds" in Amendment 65 is very broad. If the lease-purchase agreement is backed by any revenues listed above, therefore, and not by tax monies, it may be drafted as a "revenue bond" under Amendment 65.
Ark. Op. Att'y Gen. No. 94-101 (attached).
I am neither equipped nor authorized to opine whether the Horseshoe Bend contract actually constitutes a lease-purchase agreement of the sort that would qualify as a revenue bond under the definition set forth at Ark. Const. amend. 65, § 3. Nevertheless, I can and will opine that a long-term lease-purchase agreement that commits as payment only user fees generated from water-rate revenues might be permissible under Ark. Const. amend. 65. Indeed, in my opinion, the same conclusion would apply to any variety of financing that restricts repayment to such project revenues.
Having offered this general conclusion, I must reiterate my opinion that any instrument that pledged taxes or tax-financed assets as collateral for a long-term municipal loan would run afoul of Ark. Const. arts. 12, § 4, and 16, § 1. Such a contract would be wholly void as a matter of law. Warren v. State, 232 Ark. 823, 340 S.W.2d 400 (1960). See also Cookv. Shackleford, 192 Ark. 44, 90 S.W.2d 216 (1936); Goodwin v. State,235 Ark. 457, 360 S.W.2d 490 (1962) (making a contract in one year to be paid out of the revenues of a succeeding year contrary to Ark. Const. Amend.10 (art. 12, § 4), citing City of Little Rock v. White Co.,193 Ark. 837, 103 S.W.2d 58 (1937). Your constituent should consult private counsel to review the actual lease-purchase agreement under this standard.
With respect to the specific ordinance at issue here, the question also arises whether the city council was authorized to delegate to the mayor and the recorder/treasurer, "jointly and severally," the discretion to contract with the Commission for a long-term interest-bearing loan. For the reasons set forth below, I do not believe such a delegation would withstand constitutional scrutiny.
As the Arkansas Supreme Court recently declared:
 Municipalities are creatures of the legislature and as such have only the power bestowed upon them by statute or by the Arkansas Constitution. Jones v. American Home Life Ins. Co., 293 Ark. 330, 738 S.W.2d 387 (1987). See also City of Ft. Smith v. O.K. Foods, Inc., 293 Ark. 379, 133, 738 S.W.2d 96 (1987); City of Little Rock v. Cash, 277 Ark. 494, 644 S.W.2d 229 (1982). Additionally, this court has held that any substantial doubt concerning the existence of a power in a municipal corporation must be resolved against the City. City of Little Rock v. Cash, supra. Recently, this court summarized what powers can be exercised by a municipality:
 Cities have no inherent powers and can exercise only (1) those expressly given them by the state through the constitution or by legislative grant, (2) those necessarily implied for the purposes of, or incident to, these express powers and (3) those indispensable (not merely convenient) to their objects and purposes.
 Cosgrove v. City of West Memphis, 327 Ark. 324, 326, 938 S.W.2d 827, 828 (1997).
Burke v. Elmore, 341 Ark. 129, 131, 14 S.W.3d 172 (2000).
Horseshoe Bend is a city of the second class, and the legislature has chosen to restrict mayoral powers in cities falling within this category. The general mayoral powers in a city of the second class are enumerated at A.C.A. § 14-44-107:
 (a) The mayor in cities of the second class shall be ex officio president of the city council, shall preside at its meetings, and shall have a vote to establish a quorum of the council, or when the mayor's vote is needed to pass any ordinance, bylaw, resolution, order, or motion.
 (b)(1) The mayor in these cities shall have the power to veto, within five (5) days, Sundays excepted, after the action of the council thereon, any ordinance, resolution, or order adopted or made by the council, or any part thereof, which in his judgment is contrary to the public interest.
 (2)(A) In case of a veto, before the next regular meeting of the council, the mayor shall file in the office of the city recorder, to be laid before the meeting, a written statement of his reasons for so doing.
 (B) No ordinance, resolution, or order, or part thereof, vetoed by the mayor shall have any force or validity unless, after the written statement is laid before it, the council shall, by a vote of two-thirds (2/3) of all the aldermen elected thereto, pass it over the veto.
This restricted range of responsibilities stands in stark contrast to the much broader range of powers afforded the mayor of a city of the first class, including the following:
 In a city of the first class, the mayor or his duly authorized representative shall have exclusive power and responsibility to make purchases of all supplies, apparatus, equipment, materials, and other things requisite for public purposes in and for the city and to make all necessary contracts for work or labor to be done or material or other necessary things to be furnished for the benefit of the city, or in carrying out any work or undertaking of a public nature therein.
A.C.A. § 14-58-303(a).
In comparing these two statutes, I am struck by the fact that the legislature apparently has elected not to invest in a mayor of a city of the second class the power independently to contract on the city's behalf, regardless of whether the city council has authorized him to do so. Moreover, nothing in the Code suggests that a recorder/treasurer of a city of the second class might be charged with independently negotiating a city contract, much less one involving an interest-bearing loan. Section 14-44-109 of the Code cryptically offers only the following with respect to the powers of a city marshal, recorder and treasurer:
 (b) These officers shall have such powers and perform such duties as are prescribed in this subtitle, or as may be prescribed by any ordinance of the city, consistent with the provisions of this subtitle.
I strongly question whether committing the city to an interest-bearing loan would qualify as "consistent with the provisions of this subtitle."
The delegation in this instance seems materially indistinguishable from one recently addressed in Burke, in which a taxpayer successfully challenged as illegal a city council ordinance in a city of the second class purporting to delegate to the mayor the power to contract on the city's behalf. Although the city sought to justify the ordinance by invoking A.C.A. § 14-58-303(a), the court noted that that statute applies only to cities of the first class. Id. at 133. The court further concluded that the power to contract was neither incidental to an express power legislatively vested in the mayor nor essential or indispensable, as opposed to merely convenient, to the city's operations. Id. at 135. Accordingly, the court adjudged the delegation impermissible. Id.
I should note that in the wake of Burke, the legislature enacted Act 508 of 2001, which amended A.C.A. § 14-58-303 to apply to cities of the second-class and incorporated towns as well as to cities of the first class. Obviously, the very fact of this amendment, which will become effective on August 13, 2001, strongly supports the conclusion that only mayors of the first class have historically been charged with the authority to contract on behalf of the municipality.
In the present case, if the mayor or treasurer/recorder in fact independently negotiated and executed the contract, I believe a court would reach the same conclusion as did the court in Burke. However, I further believe a court might approve the contract if it were formally ratified by the city council after having been executed by one of these officials. As one of my predecessors noted in Ark. Op. Att'y Gen. No.91-289:
 It is well-established that a municipal corporation may ratify the unauthorized acts of its officers which are within the scope of the corporate powers. See generally Day v. City of Malvern, 195 Ark. 804, 807, 114 S.W.2d 459 (1938); Lykes v. City of Texarkana, 223 Ark. 287, 265 S.W.2d 539 (1954); McQuillin Mun. Corp. § 13.47 (3rd ed.).
In summary, as a general proposition, I believe a city of the second class might permissibly finance a municipal well improvement by entering into a 30-year lease-purchase agreement or by issuing to the Commission a revenue bond or note that recites a 30-year term for repayment. However, as previously noted, I further believe any debt instrument secured by local tax revenues or assets purchased with local tax revenues would not qualify as a revenue instrument and would pass constitutional muster only if drafted in conformance to Ark. Const. amend. 78. Finally, I doubt a court would approve either the fact or the breadth of the delegation of powers Ordinance No. 2001-02 purports to effect. I am not in a position to opine whether the actual contract at issue in this case accords with the general principles set forth above.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
Enclosures
[1] The procedural requirements for the issuance of such bonds are set forth at A.C.A. § 19-9-601 through -607.
[2] With respect to the 1981 Act, I should stress that this definition could apply only to an instrument issued to the Commission by a borrowing municipality, assuming repayment were made solely from project revenues, not to the bonds issued by the Commission, since the latter are general obligations whose repayment is not limited to the sources recited inHarris. See A.C.A. § 15-22-615(a) ("All bonds issued under this subchapter shall be direct general obligations of the State of Arkansas for the payment of the debt service on which the full faith and credit of the State of Arkansas are hereby irrevocably pledged so long as the bonds are outstanding.").
[3] Subsection 2(c) of the amendment provides that "[t]he provisions of this section shall be self-executing." Section 3 further provides that the amendment authorizes that the described means of incurring interest-bearing debt is "in addition" to those specified elsewhere in the constitution and statutory law. In authorizing municipalities to incur interest-bearing debt, Amendment 78, like Amendment 65, supersedes A.C.A. §§ 14-58-401 and 14-58-403(a), which restrict cities of the first class to issuing only non-interest-bearing evidences of indebtedness.
[4] Section 1 of Amendment 65 provides that the authorized revenue bonds "may bear such terms, be issued in such manner, and be subject to such conditions, all as may be authorized by the General Assembly. . . ." The legislature thus clearly has the constitutional authority to impose temporal restrictions on the repayment of revenue bonds. However, this conclusion alone does not mean that A.C.A. § 14-230-109 is beyond possible constitutional attack. Subsection (d) of the statute authorizes "[s]pecial terms for repayment of loans, including a negotiated schedule of repayment that reasonably minimizes the user charges and tax burdenupon customers. . . ." (Emphasis added.) As should be apparent from the text of my discussion, to the extent the highlighted language implies that a long-term loan might be discharged from general tax revenues, I believe this provision offends Ark. Const. arts. 12, § 4, and 16, § 1, which prohibit municipalities from issuing interest-bearing evidences of indebtedness. As noted above, this prohibition is subject only to the qualification that the people can authorize certain general indebtedness pursuant to Ark. Const. amends. 62 and 78. Amendment 65 § 3(a) authorizes long-term financing only in the form of revenue bonds — a category that might include lease-purchase agreements or instruments calling for repayment from user fees, see discussion infra, but one that does not include an instrument calling for repayment from general tax revenues.See Ark. Op. Att'y Gen. No. 89-122 (opining that a Commission loan agreement might permissibly recite a 50-year term with payments to commence when "surplus revenues" as defined accrue).
[5] The 1981 Act might be characterized as "enabling legislation" because Amendment 65 is not self-executing. See Ark. Op. Att'y Gen. No.96-063.
I must acknowledge that the use of the term "enabling legislation" is counterintuitive in light of the fact that the 1981 Act, like all of the other statutes discussed above, was enacted before the adoption of Amendment 65 in 1986. Passage of this legislation very likely reflected a then widely held belief, consistent with Supreme Court pronouncements on the subject, that despite the provisions of Ark. Const. arts. 12, § 4 and 16, § 1, municipalities could finance public improvements without voter approval. Notwithstanding its own previous pronouncements in support of this belief, the Arkansas Supreme Court reversed itself in City of HotSprings v. Creviston, 288 Ark. 286, 705 S.W.2d 415 (1986). The court offered the following analysis:
 Despite the constitutional ban against the issuance of municipal bonds without popular approval, this court created an exception more than 50 years ago. Snodgrass v. City of Pocahontas, 189 Ark. 819, 75 S.W.2d 223
(1934). There the city, pursuant to a 1933 statute, adopted an ordinance authorizing the issuance of bonds without an election, to finance improvements to the municipally owned water works. This court approved the proposal, giving its reasons in two sentences that have been often quoted to justify the creation of additional exceptions to the constitutional prohibition:
 It was manifestly the intention of the framers of Amendment 13 to prohibit cities and towns from issuing interest-bearing evidence of indebtedness, to pay which the people would be taxed, or their property appropriated to pay the indebtedness, or any indebtedness that placed any burden on the taxpayers. It was not the intention to prohibit cities and towns from making improvements and pledging the revenue from the improvements so made alone to the payment of the indebtedness.
 The Snodgrass opinion did not explain why it was manifest that the framers of Amendment 13 [since incorporated into Amendment 62] did not really mean what they said. . . . We believe the only proper and permanent course is for us simply to give effect to the plain language of the Constitution. It states that no city or county shall ever issue interest-bearing evidences of indebtedness without the consent of the electors.
288 Ark. at 289-90. The court's ruling in Creviston immediately led to the adoption of Amendment 65, which authorized the issuance of revenue bonds without voter approval.