The Honorable Paul Bookout State Senator President Pro Tempore
1900 West Washington Jonesboro, Arkansas 72401-2577
Dear Senator Bookout:
This is my opinion on your question whether the City of Jonesboro must put a proposed bond issue to the voters.
Your request states in part:
 The City would like to fund a bond issue for capital improvements, such as new police and fire stations, a public works facility and city hall renovations, by pledging the City franchise fees located in the general fund. Subsequently, the City would reimburse the general fund with the capital improvements sales tax located in the capital improvements fund.
RESPONSE
Based on and limited to facts stated in your request and its attachments, facts otherwise known to me, and facts assumed for purposes of preparing this opinion, my opinion is as follows:
The City must put the question to voters before it may issue bonds under Act 25 or Amendment 62. The City almost certainly may issue bonds under Amendment 65 without a vote, provided the bonds are secured solely by franchise fees. The bonds will not have been validly issued, however, if an arrangement to reimburse franchise fees with tax money causes the bonds to be indirectly secured by taxes, a fact-intensive question I cannot answer. The City's use of dedicated tax money to *Page 2 
reimburse franchise fees expended on bond debt service is likely permissible if limited to the amount of actual capital costs. The reimbursement is likely unlawful under Act 25 or Article 16 of the Arkansas Constitution to the extent it includes amounts for bond interest or other costs that would not have been incurred absent bond issuance.
DISCUSSION
The tax your request refers to is a city sales and use tax.[1]
"One half (½) of all proceeds derived from the . . . tax will be for financing capital improvements of a public nature." Jonesboro Ordinance 3221, § 2 (May 15, 2000), codified at Jonesboro Mun. Code § 62-76 (2006), available from
http://municode.com/library/ClientListing.aspx?stateID=4.[2]
The state law that provides for the city tax,Act 25 of 1981 (1st Ex. Sess.), codified asamended at A.C.A. §§ 26-75-201 to-223 ("Act 25"), requires a vote on the tax. A.C.A. § 26-75-207(a)(2) (Supp. 2009). Here, the city put the tax question to the voters, who approved. Jonesboro Ordinance 3260, first recital (stating as fact that voters approved tax at election held July 18, 2000) (Nov. 20, 2000).
A city with an Act 25 tax may issue bonds to provide funds to accomplish capital improvements of a public nature and may pledge of all or part of the tax proceeds to the bonds' payment. A.C.A. § 26-75-204(a) (Supp. 2009). Act 25 contains a requirement for a popular vote, separate from the requirement for a tax vote, to approve "the principal amount of the bonds and the purpose for which the bonds will be issued."[3]
A.C.A. § 26-75-205 (Repl. 2008); cf.
A.C.A. § 26-75-207(a)(2) *Page 3 
("[e]ach local sales and use tax . . . shall be adopted by ordinance . . . and with the approval of the voters. . . .").
Here, the question put to Jonesboro voters in 2000 was solely on the tax, not on municipal debt. Jonesboro Ordinance 3222, §§ 1 ("there shall be submitted to the electors . . . the question of the levy of the . . . Tax"), 2 (form of ballot) ("FOR [or AGAINST] adoption of a . . . local sales and use tax within the City of Jonesboro, Arkansas") (May 15, 2000). It is not surprising that the vote was on the tax only: nothing you provided indicates that a bond transaction was proposed or even considered in 2000.
A tax election does not constitute authority to issue debt secured by the tax. See, e.g., Op. Att'y Gen. 2008-152.
In my opinion, then, the city, not having previously held a bond election in connection with its Act 25 tax, may not, without holding such an election, issue bonds under Act 25, Amendment 62, or any other law that requires voter approval of the bonds.
Act 25 and Amendment 62 are not, of course, the only authority for municipal bond issuance. Amendment 65 comes to mind here because the city's franchise fee receipts[4] are apparently sufficient to pay debt service on the proposed bonds, and because you ask specifically about a bond election. See generally Ark. Const. amend. 65. *Page 4 
A city may issue bonds under Amendment 65 without an election if, among other things, repayment is "secured by rents, user fees, charges, or other revenues (other than assessments for local improvements and taxes) derived . . . from any . . . special fund or source other than assessments for local improvements and taxes." Ark. Const. amend. 65, § 3(a). A city's utility franchise fee receipts are almost certainly fees, not taxes, for Amendment 65 purposes. See City of Little Rock v. AT TCommc'ns of the Sw.,318 Ark. 616, 888 S.W.2d 290 (1994) (franchise fee was statutorily authorized charge for utility's use of rights-of-way, not an unauthorized tax). It follows that a city almost certainly may issue bonds without an election under Amendment 65 if the bonds are secured solely by franchise fee receipts, not by tax proceeds (and if the city complies with all other applicable requirements of Amendment 65).
Absent other facts, the inquiry ends. But the transactions you describe involve not only issuing bonds without an election but also using tax money to replenish the source of funds used to pay debt service on the bonds. The proposed reimbursement may suggest that the tax revenues are indirectly pledged to the bonds' payment. Under current law, if a court determines that an indirect pledge of tax revenues is present, the bonds will have been invalidly issued:
 Amendment 65 prohibits a city from doing indirectly that which it cannot do directly. Because Amendment 65 forbids repaying revenue bonds with assessments from [sic] local improvements or taxes, it correspondingly forbids pledging tax revenues to fill the gaps left by using other sources of monies to repay the bonds. In short, using tax revenues to offset losses caused by pledging revenues from . . . fees to cover bond indebtedness is indirectly using tax revenues to secure repayment of the bonds, which is prohibited conduct.
Harris v. City of Little Rock,344 Ark. 95, 102, 40 S.W.3d 214 (2001).
It is not clear how the rules stated in Harris would apply to the transactions considered here. Would Jonesboro's paying debt service on revenue bonds with franchise fees leave a "gap" to be filled or result in "losses caused by pledging" the franchise fees? The Harris court recited, and clearly regarded as relevant, several facts about the City of Little Rock's financial condition and practices, and *Page 5 
stated that only by assuming still more facts could it conclude that an indirect pledge was present. Id. at 101-105. Under the rules of Harris, then, the outcome of a given case will depend on all the relevant facts and circumstances. Not being a finder of fact in connection with rendering opinions under A.C.A. § 25-16-706 (Repl. 2002), I cannot make these determinations. If challenged, a court would take into account all relevant facts and circumstances which surely would include, among other things, the fact of reimbursement; any obligation to make reimbursement; the reimbursements' frequency and correspondence with bond payment dates; the sufficiency of franchise fees to pay bond debt service in full; the impact, if any, of diverting franchise fees from their current uses; and similar matters. Cf. Harris v.City of Little Rock, 344 Ark. 95, 40 S.W.3d 214 (2001) (absence of requirement for city to reimburse, from sources including tax proceeds, amounts withdrawn from user fees account and used to pay Amendment 65 revenue bonds cited as factor in finding no indirect pledge of tax proceeds). Not being a finder of fact, I cannot offer a definitive opinion on whether a court would hold the proposed transactions to be an indirect violation of Amendment 65 of the sort described in Harris.
Even if the debt were held to be validly issued under Amendment 65, however, the contemplated reimbursement may be subject to challenge under other law. One might argue, for instance, that reimbursement of franchise fees with sales tax proceeds, and the subsequent expenditure of that money for any municipal purpose, amount to an unlawful diversion of the tax money from the purpose for which the tax was levied, and an illegal exaction. See
Ark. Const. art. 16, §§ 11 ("no moneys arising from a tax levied for any purpose shall be used for any other purpose"), 13 ("[a]ny citizen . . . may institute suit . . . against the enforcement of any illegal exactions whatever"). The latter provision prohibits not only the imposition of an illegal tax but also an unlawful application of money collected under a valid tax. See, e.g.,Pledger v. Featherlite Precast Corp.,308 Ark. 124, 823 S.W.2d 852 (1992).
The ballot stated that half the tax proceeds "will be for financing capital improvements of a public nature" and half "will be for general operating purposes." Jonesboro Ordinance 3222, § 2 (form of ballot). "If the ballot indicates designated uses and the tax is approved, the proceeds shall only be used for the designated uses set forth in the ballot." A.C.A. § 26-75-208(c)(1) (Supp. 2009). *Page 6 
In my view, the ballot in this instance clearly designated the use of the half of the tax here at issue. The statute and constitutional provisions quoted above prohibit the city from spending the tax money directly on items that cannot fairly be characterized as being for "capital improvements of a public nature." Is the proposed reimbursement arrangement merely an indirect way to free the tax money of its designated use?
The facts suggest that the city proposes to satisfy its obligation to use half the tax proceeds "for financing capital improvements of a public nature" by treating the reimbursement itself as such a use. The city would, in other words, treat the tax proceeds as having been applied to capital improvements at the time of the reimbursement, without regard to how those tax proceeds are later actually spent. This presumably would be true because the (fungible) money being replaced would have been spent to pay debt service on bonds issued to finance capital improvements, an arguably appropriate use of moneys designated "for financing capital improvements of a public nature." Thus, the argument goes, the tax proceeds would be freed of the designated use restriction at the time of transfer from the capital improvements fund to the general fund, and would then become, like the franchise fee receipts, eligible for expenditure for any municipal purpose. Cf. Harris v.City of Little Rock, 344 Ark. 95, 40 S.W.3d 214 (2001).
There is some merit to this argument, but I do not believe it applies equally to reimbursement of each item for which franchise fees may be spent or applied in connection with a bond transaction.
In a typical municipal debt finance transaction, proceeds of the sale of the bonds (generally approximately equal in amount to the bonds' principal amount) are spent, in large part but by no means in whole, on the actual capital costs of the projects financed. Remaining bond proceeds are typically spent on items or used for purposes that would not arise or require payment at all absent the debt financing itself. Such items and purposes, not present in a pay-as-you-go transaction, may include funding a reserve or capitalized interest account and paying the costs of bond issuance. *Page 7 
Once the bonds are outstanding, the issuer makes periodic payments, normally to a bond trustee, who applies the money to items and purposes including interest on the bonds, any principal of the bonds when due, and other ongoing costs like the trustee's annual fee.
To the extent the reimbursement proposed here is limited in amount to the actual capital costs (described above) paid from bond proceeds, the city has at least a colorable argument that it has, immediately upon reimbursement and without regard to how the money is subsequently spent or applied, satisfied its obligation to apply those tax proceeds to capital improvements. I reach this conclusion because, clearly, the city could pay these costs with the tax proceeds directly in circumstances not involving debt financing.
It should be noted that, as implied above, a bond issue's principal amount may be significantly greater than the amount of money actually spent on capital costs. It should also be noted that the reimbursement argument may cut against the city's position that the tax is not indirectly pledged to secure the bonds, and therefore that the bonds were validly issued without an election under Amendment 65. Success on the reimbursement argument, in other words, may endanger the bonds' status under Amendment 65.
To the extent the fund transfers go further and include reimbursement of amounts applied to items like bond issuance costs and interest expense, the proposal is likely, in my view, to be unlawful under the designated-uses provision of Act 25 or one or both of the Article 16 provisions, all discussed above.
In my view, the voters approved the tax only, and the use designation of the half of the tax proceeds at issue here means that the proceeds may be used only to pay actual capital costs. "[I]f the tax was in fact a so-called `designated' sales tax, then using the proceeds to pay interest . . . will be constitutionally suspect, in my opinion, if the voters did not approve any debt when they approved the tax." Op. Att'y Gen. 2008-152.
 [It may be argued that] the tax seemingly will not have been diverted from its intended purpose(s) if the tax and the [municipal debt] are intended to fund the same improvement(s). Upon further review, however, I believe it *Page 8 
becomes apparent that this fails to recognize the important fact that the voters, in approving the sales tax, did not approve using the revenues to service debt. Instead, they approved using the revenues directly for the improvements. . . . The voters could have approved financing the improvements through sales tax-backed capital improvement bonds. But if they did not approve any debt in connection with the sales tax, then I believe it may be immaterial that the revenues are being used to effect the voter-approved improvements. Using the tax to pay interest . . . will in my opinion probably offend art. 16, § 11, if that use was not fully disclosed to the voters.
Id. (citations omitted).
I reaffirm the reasoning and conclusions of Op. Att'y Gen. 2008-152. As demonstrated above, Act 25 contains separate vote requirements for taxes and bonds. The separate requirements serve important and distinguishable purposes. The distinction is illustrated by the probability that a significant number of voters would favor a tax to build public facilities on a pay-as-you-go basis but oppose a bond issue backed by the same tax to accomplish the same projects. It may be entirely reasonable in a given case, and it is certainly within a voter's prerogative, to favor a tax to pay for capital improvements but oppose outlays for interest and other bond costs, even though using debt generally allows projects to be completed much sooner. Accordingly, it is my view, as stated in Op. Att'y Gen. 2008-152, that a tax vote that does not "fully disclose[]" a bond transaction does not serve as any authority to use tax revenues to pay amounts that would not be payable but for the debt. Here, as in the quoted opinion, it is my view that the voters approved only a pay-as-you-go scheme of "using the revenuesdirectly for the improvements," not "using the revenues to service debt."
It is suggested that, in this case, the tax ballot's use of the word "financing" implies the issuance of debt and therefore that the tax money at issue may be spent for interest and other amounts that would not be payable absent the bond issue. I disagree. "Finance" means "[t]o raise or provide funds."Black's Law Dictionary 706 (9th ed. 2009). "Financing" means "[t]he act or process of raising or providing funds." Id. at 707. Neither definition suggests that debt is necessarily or even presumably present in connection with finance or financing. In my view, the tax *Page 9 
levy itself, obviously being a means to raise and provide funds, is the financing referred to in the ballot. I am of the opinion, accordingly, that a court would be likely to hold that the ballot did not fairly or fully disclose that an affirmative vote would be deemed a vote in favor of debt as well as the tax. I believe a court accordingly would further hold that the tax proceeds at issue may be spent only for actual capital costs. Applying the tax proceeds to non-capital costs would, in my view, be likely to be held to breach the city's obligation to apply half the tax proceeds to capital improvements and therefore to contravene A.C.A. § 26-75-208(c)(1) or one or both of the Article 16 constitutional provisions discussed above.
Assistant Attorney General J. M. Barker prepared this opinion, which I approve.
Sincerely,
 DUSTIN McDANIEL Attorney General
DM:JMB/cyh
[1] The city imposed the tax under authority of A.C.A. §§ 26-75-201 to-223 (Repl. 2008, Supp. 2009). Jonesboro Ordinance 3221, second recital (May 15, 2000).
[2] The other half of the tax proceeds is "for general operating purposes." Jonesboro Ordinance 3222, § 2 (form of ballot) (May 15, 2000). Your request states that money for reimbursement would come from the "capital improvements fund," so I assume reimbursements would be made only from the capital improvements half of the tax proceeds.
[3] Amendment 62, providing constitutional authority for local tax-backed bonds for "capital improvements of a public nature," itself requires a vote on bond issuance. Ark. Const. amend. 62, § 1(a).
[4] I assume your request refers to city franchise fees imposed on public utilities under authority of A.C.A. § 14-200-101(b)(1)(A)(i)(b) (Supp. 2009). It appears that a city may spend franchise fee revenues for any municipal purpose. See Harris v. City of Little Rock,344 Ark. 95, 115, n. 1, 40 S.W.3d 214 (2001) (Imber, J., concurring) (noting that franchise fees were deposited in city's general fund);City of Little Rock v. AT T Commc'ns of the Sw.,318 Ark. 616, 636, 888 S.W.2d 290 (1994) (Corbin, J., dissenting) (describing testimony of deputy city manager to effect that franchise fee receipts were "to be used for all municipal purposes without restriction" and concluding that "fee was collected to supplement [city's] general revenues without special use restriction");AT T Commc'ns of the Sw. v. City of Little Rock,44 Ark. App. 30, 33, 866 S.W.2d 414 (1993) (noting same testimony, to effect that receipts "would be spent for all municipal purposes without restriction [and] not dedicated to any particular purpose"). I assume for purposes of this opinion that Jonesboro's franchise fee receipts are unrestricted and may be spent for any municipal purpose. *Page 1